# Exhibit A

**In re Felipe Nery Gomez**
Attorney-Respondent

Commission No.  2020PR00064

**Synopsis of Hearing Board Report and Recommendation**
(January 2022)

The Administrator filed a three-count Complaint against Respondent, alleging he sent numerous threatening and harassing emails to other attorneys. The Hearing Panel found that Respondent's abusive language had no substantial purpose other than to delay, embarrass or burden third persons and prejudiced the administration of justice.

Based on the serious misconduct, and aggravating factors including Respondent's conduct during the disciplinary proceedings, the Hearing Panel recommended that Respondent be suspended for three years and until further order of the Court.

**BEFORE THE HEARING BOARD**
**OF THE**
**ILLINOIS ATTORNEY REGISTRATION**
**AND**
**DISCIPLINARY COMMISSION**

In the Matter of:

**FELIPE NERY GOMEZ,**

     Commission No.  2020PR00064

    Attorney-Respondent,

     No.  6197210.

**REPORT AND RECOMMENDATION OF THE HEARING BOARD**

SUMMARY OF THE REPORT

Respondent engaged in misconduct when he sent threatening and harassing email messages to other attorneys. Based on the pattern of serious misconduct, the factors in aggravation, the minimal factors in mitigation, and the relevant case law, we recommend that Respondent be suspended for three years and until further order of the Court.

INTRODUCTION

The hearing in this matter was held remotely by video conference on August 4 and 5, 2021, before a Panel of the Hearing Board consisting of Kenn Brotman, Chair, Kenya A. Jenkins-Wright, and John Burns. Tammy L. Evans represented the Administrator. Respondent was present and represented himself.

PLEADINGS

The Administrator filed a three-count Complaint against Respondent, alleging he directed numerous insulting and threatening communications toward other attorneys. In his Answer, Respondent denied engaging in misconduct and raised the defenses that the Rules of Professional

**FILED**

January 07, 2022

**ARDC CLERK**

Conduct did not apply to him when he was acting as a party and that his statements were constitutionally protected speech.

## ALLEGED MISCONDUCT

In each of the three Counts before us, the Administrator charged Respondent with (1) in representing a client, using means that have no substantial purpose other than to delay, embarrass or burden third persons; and (2) engaging in conduct that is prejudicial to the administration of justice, in violation of Rules 4.4(a) and 8.4(d) of the Illinois Rules of Professional Conduct (2010).

## EVIDENCE

The Administrator called Vincent P. Schmeltz, III, Steven Badger, Christina Sanfelippo, Mark Morris, Jeffrey Widman, and Amber Ritter as witnesses. The Administrator called Respondent as an adverse witness, but he refused to testify, citing his Fifth Amendment privilege against self-incrimination and the Administrator's failure to serve him with a subpoena. The Administrator's Exhibits 1, 2, and 4 were admitted into evidence. (Tr. 69, 224, 455). Respondent did not present any evidence.

## PRE-HEARING PROCEEDINGS

Before the hearing commenced, Respondent requested a continuance because he had motions pending in the Illinois Supreme Court for certain witnesses to comply with his deposition subpoenas, as well as a motion asking the Court to stay the hearing. The Chair denied Respondent's request on the ground that he had been given ample time to complete discovery. On August 11, 2021, after the conclusion of the hearing, the Court denied all of Respondent's motions.

The Chair denied as untimely motions *in limine* that Respondent filed on the morning of the first day of the hearing, with the exception of a standard motion to exclude witnesses. The Chair had previously ordered that all motions *in limine* be filed by July 26, 2021. The Chair also denied Respondent's motion to deem facts admitted on the ground that it improperly asked the

2

Administrator to admit to legal conclusions and interpretations of Rules of Professional Conduct that were properly within the province of the Panel.

The Chair denied Respondent's motion to take judicial notice of an order entered by the Executive Committee of the United States District Court for the Northern District of Illinois, which addressed the applicability of ABA Model Rule of Professional Conduct 4.4 to a portion of the conduct at issue in this matter. The Chair advised that the Panel would consider the order as Respondent's legal precedent.

FINDINGS OF FACT AND CONCLUSIONS OF LAW

The Administrator bears the burden of proving the charges of misconduct by clear and convincing evidence. In re Thomas, 2012 IL 113035, ¶ 56. Clear and convincing evidence constitutes a high level of certainty, which is greater than a preponderance of the evidence but less stringent than proof beyond a reasonable doubt. People v. Williams, 143 Ill. 2d 477, 577 N.E.2d 762 (1991). The Hearing Board assesses witness credibility, resolves conflicting testimony, makes factual findings, and determines whether the Administrator met the burden of proof. In re Winthrop, 219 Ill. 2d 526, 542-43, 848 N.E.2d 961 (2006).

**I.  Respondent is charged with sending harassing and threatening emails to other attorneys during the pendency of his litigation against Charles Schwab Corporation.**

A. Summary

Respondent sent emails to attorneys Vincent P. Schmeltz, III and Steven Badger that had had no substantial purpose other than to harass, embarrass and burden them. This conduct also prejudiced the administration of justice.

B. Admitted Facts and Evidence Considered

Evidence Common to All Counts

Respondent has been licensed to practice law in Illinois since 1988. On October 8, 2019, in response to complaints about Respondent's conduct in the Schwab and Cubesmart matters set forth in greater detail below, the Executive Committee of the United States District Court for the Northern District of Illinois disbarred Respondent from the practice of law in that court until further order. Respondent denies that the Executive Committee's order was valid but does not deny that it was entered. (Ans. at par. 4).

Schwab Litigation

On January 27, 2019, Respondent filed a complaint on behalf of his son, Arthur Gomez, against Charles Schwab Corporation (Schwab) in the United States District Court for the Northern District of Illinois. Attorney Vincent P. Schmeltz, III, of Barnes & Thornburg, represented Schwab. (Tr. 60). On April 17, 2019, Respondent filed a second amended complaint that added himself as a plaintiff. (Ans. at pars. 5, 7).

On March 4, 2019, Respondent issued a subpoena to Bank of America in connection with the Schwab litigation. (Ans. at par. 6). Schmeltz advised Respondent that he believed the subpoena was premature because the parties had not conferred prior to seeking discovery, as required by Federal Rule of Civil Procedure 26(f). Schmeltz sent Bank of America a letter on April 18, 2019, stating that it did not have to respond to the subpoena at that time. (Adm. Ex. 1 at 14-15).

On April 21, 2019, Easter Sunday, Schmeltz received an email from Respondent that was sent at 8:01 a.m. It stated in relevant part:

> Happy Easter, Schmatlz [sic] you are being referred to the FBI today. You are insane to have done this, clear attempted obstruction. Maybe you should watch the news, obstruction is a big topic. I will also motion this up for her Honor to weigh

4

in re [sic] protective order. What country do you live in? Here, a subpoena is inviolate and you violated the authority of the Court.

You sir are despicable and unfit to practice law and I pledge to bring the full weight of Justice down on you.

Disgusting.

(Adm. Ex. 1 at 46).

At 10:14 a.m. that same day, and before Schmeltz had provided any sort of response to the

previous email, Respondent sent Schmeltz another email and copied attorneys James T. Hultquist

and Virginia Prihoda. Prihoda represented Respondent's son in other matters. (Tr. 85). The nature

of attorney Hultquist's involvement is not clear from the record. The email stated as follows:

Dear Perp: We have determined you are engaged in active tampering and obstruction, and I have a second opinion from former law enforcement counsel in agreement.

We demand you stop any communication with BA, and you formally withdraw your letter for which you undiscovered email despite all other comms being email, further highlighting your incredibly stupid subterfuge that seems to have no substantial benefit.

You and your firm are on notice we consider you an active criminal and are impeding a federal subpoena with malice aforethought and intent to hide the Truth [sic] from your own client Arthur and The People [sic].

Shmuchs:

I will prosecute you into bankruptcy and prison. I. Gurantee [sic]. It.

(Adm. Ex. 1 at 19).

Sixteen minutes later, at 10:30 a.m., Respondent copied Schmeltz, Hultquist, and Prihoda

on an email to Assistant U.S. Attorney Paul Mowrer, demanding that Mowrer take action against

Barnes & Thornburg. (Adm. Ex. 1 at 46). Respondent sent Schmeltz another email at 1:50 p.m.,

which was copied to Mowrer, Hultquist, and Prihoda, and stated as follows:

I will not pursue you if you self report them [sic] plea to what you did immediately. RICO allows parallel prosecution but you and Barnes weren't and are not my

> primary Targets [sic], you just fd [sic] up big time and i [sic] report active crooks i
> [sic] run across if they do not abate on the shot across the bow.
>
> You have quadrupled down and again it appears you have put economic self interest
> ahead of your client's. You will be reported of course that cannot be settled it isn't
> my claim.
>
> Resign and plea to FBI and i [sic] don't name and flay you on a public pillory for
> all to see so as to discourage scum like yourself.

(Adm. Ex. 1 at 17.)

Schmeltz notified his firm's deputy general counsel, Steven Badger, of Respondent's

emails. (Tr. 96). On April 22, 2019, Badger sent Respondent an email asking him to stop making

"improper personal attacks" in his communications. (Adm. Ex. 1 at 22). Respondent responded

by sending Badger an email telling him to "[s]top emailing me now or i [sic] call police."

Respondent stated multiple times that Badger and his firm "will be prosecuted" and "are being

prosecuted" and threatened to sue Badger under RICO. He further stated, "I plaintiff, will add

you, new perp, when and if I have to RICO the individual attorneys." (Adm. Ex. 1 at 21-22 ).

On April 23, 2019, Respondent sent Badger the following email:

> With zero respect, idiot, I told you not to contact me. I am a plaintiff. You are
> barred, and you just violated the Rules again.
>
> You obey no rules or no one. I remember what scum BT is from 10 years of suing
> scum polluters and then having outhouse counsel run up the bill in unethical manner
> until i [sic] had to leave the sharks in the room repeating themselves to each other.
> You are entitled to be heard. Once.
>
> Dont [sic] pull your crap on me. Schmuckz [sic] and your firm are scum of the
> Earth and need to be abated. Under RICO I am private AG and doing the abating,
> since you seem very cozy with the USA here and since this office seems frozen,
> except for letting crooks like Shock [sic] get off and then allow him to attack a
> fellow AUSA who wanted to do the right thing and prosecute that piece of poop.
>
> BT is in my opinion a scumbag firm as evidenced by the repeated flaunting of the
> Rules whilst impugning a named party for not following them.
>
> You will be pursued for harassing me after i [sic] told you to bug off.
>
> Get outside Counsel. Be an Attorney [sic] not a thug.

DO NOT CONTACT ME DIRECTLY IDIOT.

(Adm. Ex. 1 at 28).

Respondent sent another email on April 23, 2019 to Schmeltz, in which he refers to Schmeltz as "Counsel/Perp" and to Badger as "Co-perp Badger." Respondent also referred to a prior incident when Schmeltz was disciplined by the federal court for taking a photo during a trial he was observing and posting it online. Respondent closed the email by stating, "You Sir are going to taste what total defeat and carrer [sic] ending tastes like. I guarantee it." (Adm. Ex. 1 at 26).

On April 26, 2019, Schmeltz filed a motion to quash the Bank of America subpoena and to direct Respondent to communicate civilly. Respondent voluntarily dismissed his lawsuit the following day, but continued to send emails to Schmeltz. (Adm. Ex. 1 at 41-42). On May 12, 2019, Respondent sent Schmeltz an email stating he would "arrange to publicallt [sic] notify your employees of the ongoing crime… and offer a large whistle blower reward to turn you in." He then stated he would report Schmeltz to various news organizations. (Adm. Ex. 1 at 33).

Respondent admitted the emails to Schmeltz and Badger were sent but objected to their admission on hearsay and authentication grounds. (Ans. at pars. 9, 11, 16, 18, 22; Tr. at 67-68). The emails originated from an account named "Law Office of Felipe Gomez" with an address of t312.509.2071@gmail.com. (Adm. Ex. 1). This is the same email address Respondent provided on his Answer in this case. (Ans. at p. 23).

Schmeltz testified that Respondent's emails embarrassed him and felt harrassing. (Tr. 104). They were "incredibly burdensome" because Schmeltz felt the need to address the U.S. Attorney's Office as well as his firm management to discuss whether they had any liability as a result of Respondent's accusations. (Tr. 106-107). Schmeltz felt Respondent was attacking and trying to intimidate him instead of conferring to try to resolve their dispute. (Tr. 94-95).

7

Badger was shocked by the personal attacks and hostility from Respondent. He felt Respondent was directing baseless threats to try to intimidate him. (Tr. 187-91). Even though he knew the threats were baseless, he was concerned that Respondent's attempts to initiate a federal investigation could create bad publicity and difficulty for his firm. (Tr. 194).

C. Analysis and Conclusions

Rule 4.4(a)

Rule 4.4(a) provides, "In representing a client, a lawyer shall not use means that have no substantial purpose other than to embarrass, delay, or burden a third person, or use methods of obtaining evidence that violate the legal rights of such person." Respondent asserts that Rule 4.4(a) did not apply to him because he was a party to the Schwab lawsuit. He also contends the statements in the emails were protected opinions under the First Amendment and were substantially related to the litigation.

For the following reasons, we find the Administrator proved the elements necessary to establish a violation of Rule 4.4(a) by clear and convincing evidence. Rule 4.4(a) applies to the conduct of lawyers "in representing a client." Contrary to Respondent's assertion, Rule 4.4 governed his conduct in the Schwab litigation. The most obvious reason why it applied is that Respondent represented his son, Arthur Gomez, in addition to representing himself. Moreover, even if Respondent represented only himself, he was required to comply with Rule 4.4(a). In In re Segall, 117 Ill. 2d 1, 509 N.E.2d 988 (1987), an attorney who represented himself in litigation with his credit card companies was charged with improperly contacting a party he knew to be represented by counsel. The Illinois Supreme Court held that "[a]n attorney who is himself a party to the litigation represents himself when he contacts an opposing party." Segall, 117 Ill. 2d at 6. The Court's reasoning has been applied in multiple cases in which an attorney representing himself has been charged with violating Rule 4.4(a). See In re Zurek, 99 CH 45, M.R. 18164 (Sept. 19,

2002); In re Ras, 01 CH 18, M.R. 18605 (March 19, 2003); In re O'Shea, 02 CH 64, M.R. 19680 (Nov. 17, 2004).

Respondent contends there is a "split in authority" as to whether Rule 4.4(a) applies to lawyers who represent themselves in a lawsuit. He relies on a portion of the Executive Committee Order entered on October 8, 2019, which agreed with Respondent that ABA Model Rule 4.4(a) did not apply to him in the Schwab and Cubesmart matters because he was acting *pro se*. While we have taken note of the Executive Committee's Order, the Illinois Supreme Court is the ultimate authority in ARDC disciplinary matters, and its interpretation of the Illinois Rules of Professional Conduct is controlling. (See In re Palmisano, 92 CH 109, M.R. 10116 (May 19, 1994) (Review Bd. at 6), declining to rely on an opinion of the United States Court of Appeals for the District of Columbia Circuit because it was "not binding and cannot serve as a basis for reaching a conclusion contrary to Illinois Supreme Court precedent"). Consequently, we follow the Court's opinion in Segall and the Hearing and Review Boards' subsequent application of Segall in concluding that Rule 4.4(a) applied to Respondent's conduct at all times at issue in this matter, regardless of whether Respondent was representing only himself or was representing another person.

In our role as trier of fact, we consider circumstantial evidence, draw reasonable inferences and need not be naïve or impractical in assessing the evidence. In re Isaacson, 2011PR00062, M.R. 25805 (March 15, 2013). Respondent admits "the emails were sent" but stops short of admitting he sent them. We find there is clear and convincing evidence that Respondent drafted and sent the emails at issue in Count I. The emails indicate they came from "Law Office of Felipe Gomez, Esq." and originated from the same gmail address Respondent provided on pleadings he has filed in this proceeding, including his Answer. In addition, the emails contained information that was unlikely for anyone but Respondent to know, including information about the particulars of the Schwab litigation as well as prior matters in which Respondent was involved. We further

9

find that the emails all displayed a similarly hostile and aggressive tone, which is consistent with Respondent's demeanor during this disciplinary hearing.

The Administrator further proved that Respondent's emails to Schmeltz and Badger had no substantial purpose other than to embarrass or burden them. Violations of Rule 4.4(a) have been found when a lawyer, in the course of representing a client, used vulgar, offensive, or intimidating language. See In re Moore, 2015PR00076, M.R. 028896 (Sept. 22, 2017) (Hearing Bd. at 12). Respondent's language calling Schmeltz "Schmaltz" and "Schmuchs," referring to Schmeltz and Badger as "disgusting," "despicable," "scum," "idiot," "perp," and "active criminal," and threatening to end Schmeltz's career and "flay him on a public pillory" were objectively offensive and threatening. Moreover, this language did, in fact, cause Schmeltz and Badger to feel embarrassed, harassed, and concerned.

The fact that Respondent's emails arose in response to Schmeltz's letter to Bank of America does not mean they had a valid purpose. In In re Gerstein, the Hearing Board determined that the existence of some legitimate purpose in a communication does not negate the application of Rule 4.4. "It is the Respondent's use of offensive, vulgar, and derogatory language that constitutes a violation of Rule 4.4, because the use of that language has no substantial purpose other than to embarrass or burden the recipient." In re Gerstein, 99 SH 1, M.R. 18377 (Nov. 26, 2002) (Hearing Bd. at 22). Rather than addressing a discovery dispute through the meet and confer process, Respondent used the dispute as an excuse to bombard Schmeltz and Badger with insults and threats. This conduct was a clear violation of Rule 4.4(a).

Respondent's assertion that his statements were protected opinions under the First Amendment lacks merit. Although attorneys have certain rights under the First Amendment, such protections do not apply to verbal abuse. See Zurek, 99 CH 45 (Review Bd. at 11), and cases cited therein.

10

Rule 8.4(d)

Rule 8.4(d) prohibits an attorney from engaging in conduct prejudicial to the administration of justice. In order to prove a violation of this Rule, the Adminstrator must establish actual prejudice. Evidence that a respondent's improper remarks led to unnecessary court time, lawyer time, litigant expense, and animosity between counsel establishes actual prejudice. See In re Cohn, 2018PR00109, M.R. 30545 (Jan. 21, 2021) (Hearing Bd. at 12).

Here, there was ample evidence of actual prejudice to the administration of justice. Schmeltz had to spend time addressing Respondent's improper threats rather than addressing the substance of the Schwab case. The same was true for Badger, who was not an attorney of record and had no involvement in litigating the Schwab case. The Executive Committee had to devote time and resources to addressing Respondent's conduct as well. Based on this evidence, we find the Administrator proved by clear and convincing evidence that Respondent's conduct prejudiced the administration of justice.

**II.     Respondent is charged with sending harrassing and insulting emails in connection with the Cubesmart matter that had no substantial purpose other than to burden and embarrass Christina Sanfelippo, Jeffrey Widman, and Mark Morris.**

A. Summary

Respondent sent numerous harassing and verbally abusive emails to Christina Sanfelippo, Jeffrey Widman and Mark Morris, which had no substantial purpose other than to burden and embarrass them and which prejudiced the administration of justice.

B. Evidence and Admitted Allegations

In February 2019, Respondent filed a federal lawsuit in the Northern District of Illinois on his own behalf against Cubesmart, a storage facility. (Ans. at par. 25). Christina Sanfelippo represented Cubesmart and was an associate with Fox Rothschild at the time of the events at issue. (Tr. 218- 19).

Sanfelippo testified that she communicated with Respondent primarily by email because he shouted at her and hung up on her when she tried to speak to him by phone. On April 29, 2019, Sanfelippo filed a motion for sanctions against Respondent, after which the tenor of his communications "changed drastically." (Tr. 221-22).

On May 1, 2019, Respondent sent an email to Sanfelippo and her secretary that expressed his displeasure with the motion for sanctions and said, in part, "I intend to RICO you, personally, your firm, and your client and will amend as of right very soon." (Adm. Ex. 2 at 4).

When Sanfelippo filed the motion for sanctions, her notice indicated a presentment date of May 8, 2019, but the docket entry listed the date incorrectly as May 8, 2020. (Adm. Ex. 2 at 2). Sanfelippo corrected the problem and filed an amended notice on May 6, 2019, but Respondent became upset and claimed he did not have sufficient notice of the motion. (Tr. 222). He responded by sending two emails to Sanfelippo and Judge Dow's courtroom deputy, Carolyn Hoesly, in which he asserted that Sanfelippo's amended notice was improper, stated that Sanfelippo was barred from contacting him, and accused her of harassing him. (Adm. Ex. 2 at 5). He sent additional emails to Sanfelippo and Hoesly on May 6 and 7, in which he protested the court's "ex parte comms" with Sanfelippo and asked why the court was "favoring" Cubesmart. (Adm. Ex. 2 at 9, 12).

Respondent's conduct caused Sanfelippo to seek assistance from Jeffrey Widman, the managing partner of Fox Rothschild's Chicago office. (Tr. 346-47). On May 8, the date on which Sanfelippo noticed the motion for sanctions, she asked Widman to accompany her to court because she did not want to be alone with Respondent. Widman and Sanfelippo went to court but did not appear before Judge Dow because, before the motion had been called, Judge Dow had entered an order setting a briefing schedule and striking the notice of motion date. Respondent was running

12

late and apparently was not aware of Judge Dow's order, as he sent Sanfelippo an email at 9:45

a.m. that stated, "I will have you disciplined."

At 10:05 a.m. on May 8, 2019, Respondent sent the following email to Mark Morris, the

managing partner of Fox Rothschild, who practices in Pennsylvania:

> I am plaintiff pro se in this case. Your firm has violated my rights as a litigant and
> abused the process as indiciated by your attorney apparently lying re calling
> chambers (Carolyn was out of town) and scamming bad notice, and the motion to
> dismiss labled [sic] a motion for sanctions. All for profit as i [sic] am sure you
> didn't do it for free.
>
> See eg [sic] 19cv0540 and 18cv4818. I RICO scum bag firms that lie and cheat. I
> also released both the Smollett and Foxx dumps myself. I am FOIAg [sic] the court
> re sanscamsfelipe [sic] alleged ex parte comms to see if she is telling the truth ...
> i [sic] think she lied to me and the court. The filer picks the year not the system, she
> screwed up and tried to cover up.
>
> Once i [sic] have the evidence i [sic] am going to Chief Judge Castillo to complain
> and request discipline as the LITIGANT, as I am pro se.
>
> I am open to settling this case which has bad UCC notice thus your client must
> renotice and start over. 5,000 non negotiable [sic]. I will not agree not to complain
> as that is illegal so do not even go there.
>
> You sir are a Subject along with Ms. (In my op [sic]) Liar.
>
> I will not deal with sanliarippo.
>
> Fyi [sic] i [sic] released both the Smollett and Foxx dumps to WGN then Fox then
> NYT. I will. [sic] copy you on the Smollett releases to prove I do FOIA for The
> People. I will expose your firm next.
>
> Settle dude or rip y'all [sic] a new one.

(Adm. Ex. 2 at 19).

At 10:18 a.m. that same day, Respondent sent another email to Morris and Sanfelippo that

stated, "Liars will be prosecuted. Sanfelippo is a Target [sic] with your firm. I am dead serious."

(Adm. Ex. 2 at 23). Sanfelippo felt concerned for her safety after reading this email. (Tr. 238).

Morris also felt concerned after reading Respondent's reference to Sanfelippo as a "Target." He

felt Respondent's emails were aggressive and threatening. (Tr. 312-316).

About one hour later, Respondent sent an email to Sanfelippo, Morris, and Hoesly, in which he requested records of communications between any Fox Rothschild attorney or staff member and "Judge Dow's Court" related to the Cubesmart matter. Respondent indicated he was making the request "Pro Se as a Party" and was "not actually acting formally under my License, just a party." He signed the request "Felipe Gomez Pro Se (not Esq.)." (Adm. Ex. 2 at 24).

At 12:49 p.m. the same day, Judge Dow made a docket entry in response to Respondent's email to Hoesly. Judge Dow noted that Respondent's email looked "more like a discovery request than a request for routine case management and scheduling information." Judge Dow further noted that Respondent had adequate notice of Sanfelippo's motion, and it should have been obvious that the docket entry with the incorrect year was an unintentional typographical error. Judge Dow ordered that, "given the tenor of the email correspondence thus far," all further communications with the Court were required to be done by motion. (Adm. Ex. 2 at 28).

On May 9, 2019, Respondent sent an email to Sanfelippo and Widman that stated in part:

Guess you can't tell when you are being fed the legal rope slowly tightening around your neck and that you are tightening it without my direct help.

I will flip His Honor's wrath. Guatanteed [sic]. Get this over.

(Adm. Ex. 2 at 31).

A series of emails followed on May 10, 2109, in response to Widman's and Sanfelippo's efforts to finalize a settlement with Respondent. At 10:34 a.m. he sent Widman an email that stated:

Yo Jeff. You ignored my terms in the first signed doc. NOTE THE NOON DEADLINE FOR THE WIRES.

NO MORE BULLSHIT. I SUE YOU AND NAME YOU PERSONALLY IF YOU F [sic] AROUND ANY MORE.

THIS IS IT SEND MY FG [sic] MONEY.

14

Case 23-03023   Doc 161-1   Filed 09/11/23   Entered 09/11/23 16:23:04   Desc Exhibit
A   Page 17 of 28


At 10:52 a.m., Respondent sent Widman another email that stated "I am putting your name on now you keep fg [sic] around I can tell you a [sic] a shit. Get ready for judgment day." (Adm. Ex. 2 at 34). At 11:05 a.m., Respondent sent an email that stated in part:

> I had already begun amending some time ago, I am halfway there. I half hope you fuck this up and I get to sue your smirky face. Seriously, this is borderline ciminal crap…you are not Trump you Sir are touchable.

Respondent continued to send emails throughout the afternoon of May 10 in which he referred to Widman as a "scammer" and repeatedly threatened to "RICO" Widman and Sanfelippo. Widman took Respondent's threats seriously. (Tr. 349-50, 353-355; Adm. Ex. 2 at 36-46).

Sanfelippo testified she felt fear, concern, and embarrassment as a result of Respondent's emails. (Tr. 227). She was particularly embarrassed that Respondent disparaged her to Morris, whom she had never met and who was not involved in the Cubesmart case. (Tr. 236).

Sanfelippo and Widman both testified that Respondent's conduct delayed the settlement. (Tr. 245-46). According to Widman, he "spent the majority of that entire day trying to negotiate a settlement with someone who was threatening me throughout the entire day while trying to represent my client and not have them the subject of yet another lawsuit by Mr. Gomez all the while being concerned for my own and Ms. Sanfelippo's safety." (Tr. 368).

C. Analysis and Conclusions

Rule 4.4(a)

In the Cubesmart matter, Respondent was the sole plaintiff and represented himself. For the reasons set forth in our discussion of Count I above, Respondent was obligated to comply with Rule 4.4(a) regardless of whether he represented only himself or another entity. See Segall, 117 Ill. 2d at 6; Zurek, 99 CH 45; Ras, 01 CH 18; and O'Shea, 02 CH 64. Respondent's efforts to disclaim that he was acting as an attorney in the Cubesmart litigation have no legal effect as far as this disciplinary proceeding is concerned.

We find the Administrator proved by clear and convincing evidence that Respondent sent the emails at issue to Sanfelippo, Widman, and Morris. They originated from the same gmail address as the emails discussed in Count I, from an account bearing the name "Law Office of Felipe Gomez, Esq." Respondent acknowledges the emails were sent, and we have no reason to believe anyone other than Respondent sent them. They contained information about the Cubesmart litigation that was unlikely to be known to another person, especially considering that Respondent was the sole plaintiff. In addition, they are strikingly similar in tone to the emails in Count I, which we found Respondent sent.

Respondent's profanity and references to Sanfelippo as a "liar," "Sanscamfelippo" and "Sanliarippo" had no legitimate purpose. Similarly, violent imagery such as describing people as "targets," referring to a "legal rope tightening around your neck," and threatening to "rip y'all a new one" has no place in the practice of law and was clearly intended to intimidate the recipients. Regardless of whether the language arose in the context of litigating or settling the Cubesmart matter, it had no substantial purpose other than to burden the recipients. Sanfelippo and Widman credibly testified that Respondent's language caused them to feel harassed and to fear for their safety. It is also clear that Respondent's primary purpose in contacting Mark Morris was to retaliate against Sanfelippo after Judge Dow chastised Respondent. Respondent had no valid reason to contact Morris, who had no responsibility for the Cubesmart matter and practices in Pennsylvania. For all of these reasons, we find the Administrator proved by clear and convincing evidence that Respondent violated Rule 4.4(a).

### Rule 8.4(d)

The evidence established that Respondent's emails to Hoesly and Sanfelippo caused Judge Dow to enter an order admonishing Respondent and prohibiting further email communication with the Court. Thus, Respondent's conduct caused unnecessary work for the Court that distracted from

16

the merits of the underlying matter. We also find credible the testimony of Sanfelippo and Widman that Respondent's unprofessional conduct impeded the settlement process. Based on the foregoing evidence, the Administrator proved that Respondent caused actual prejudice to the administration of justice, in violation of Rule 8.4(d).

**III.    Respondent is charged with sending harassing emails to Amber Ritter in connection with a subpoena he issued to former mayor of the City of Chicago Rahm Emanuel.**

A. Summary

The evidence established that Respondent sent numerous emails to Amber Ritter that were abusive and harassing, had no substantial purpose other than to embarrass and burden Ritter, and caused prejudice to the administration of justice.

B. Evidence Considered

Respondent represented Bryan Singer in a lawsuit involving a dispute with Singer's condominium association. The lawsuit was filed in the United States District Court for the Northern District of Illinois. On July 31, 2018, Respondent directed a subpoena to Rahm Emanuel, seeking records in the possession of the City of Chicago related to Singer or the subject property. Amber Ritter, who was Chief Assistant Corporation Counsel for the City of Chicago, received the subpoena and contacted Respondent to discuss its scope. (Tr. 391-92).

On August 30, 2018, Ritter provided Respondent with documents from the Department of Buildings that were responsive to Repsondent's request. In September 2018, Ritter had further communications with Respondent about subpoenas he issued to City employees to testify at a hearing in the Singer matter. On the morning of the hearing, September 17, 2018, Respondent left Ritter a voicemail in which he said she would be the cause of him crashing his car because he was trying to call and email her while driving, and another voicemail in which he sang "99 Bottles of Beer on the Wall." (Tr. 406).

When Ritter appeared in court for the hearing, she declined to shake Respondent's hand because his emails and voicemails were disturbing and made her uncomfortable. Respondent then became irate and told Ritter she worked for him because she was a public servant. (Tr. 411-12). Respondent's communications became "more disturbingly belligerent" after this incident. (Tr. 413-14).

Over the following two-week period, Respondent sent Ritter "dozens and dozens of emails." (Tr. 429). The emails came from an account entitled "Law Office of Felipe Gomez, Esq" with an email address of t312.399.3966@gmail.com. In multiple emails, Respondent demanded that Ritter resign from her job and accused her of approving of police misconduct. (Tr. 418). On September 25, 2018, Respondent sent four FOIA requests to the Mayor's office, including two in which he named Ritter personally and sought information that was unrelated to the Singer matter. The sender's address for the emails to Ritter was the same address Respondent included on the subpoenas he issued in connection with the Singer case (Adm. Ex. 4 at 19-30), as well as his FOIA requests involving Ritter. (Adm. Ex. 4 at 76).

Ritter considered Respondent's FOIA requests and emails to be a form of personal harrassment. (Tr. 426-27). Respondent also threatened to sue Ritter personally. Ritter described Respondent's conduct as "confusing, confounding, and frustrating and a little bit scary." (Tr. 430).

On September 26 and September 28, 2018, Ritter provided Respondent with additional documents he requested from the Chicago Police Department. Ritter then advised Respondent that she intended to file a motion for a protective order asking the court to rule that the City had satisfied Respondent's subpoena. Ritter asked Respondent if he opposed the motion, which led to several exchanges. Respondent indicated he would consider the subpoena closed but asked Ritter to voluntarily produce additional documents. Respondent then filed a document entitled "Closing of 7.30.18 Subpoena Duces Tecum to Mayor Emanuel." When Ritter chose to proceed with her

18

motion, Respondent sent her an email that said, "KNOCK IT OFF. IF YOU MAKE A MOTION
TO NARROW A CLOSED SUBPOENA I WILL SANCTION YOU." Shortly thereafter, he sent
another email that said in part, "Why do you persist in being, IN MY OPINION, totally
unprofessional? As a Citizen [sic], Mr. Singer again asks that you Please [sic] resign now." (Adm.
Ex. 4 at 137).

> Later that day, Respondent sent the following email to Ritter:
>
> Unless there is an emergency or the City decides to settle, and in view of your
> totally unprofessional refusal to shake my hands [sic] in court (I even shook Zane's
> hand, and hopefully will again, in reverse manner, soon), and, in my opinion, total
> continuation of your horrible attitude including contumacious disregard of your
> oaths and the rule of law both related to not responding to a 7.30.18 Subpoena until
> 9.28.18 and then threatening the undersigned with an unneeded motion that you
> stated you would lie in regarding my position, I ask that you not contact this office
> any more as we will not read anything issuing from your hand or otherwise respond.
>
> If the Mayor has anything to say he can call himself or use another representative
> that we can trust.
>
> Unfortunately for you, this is not the end of it, but the Big Fish comes first.

(Adm. Ex. 4 at 141).

On October 5, 2018, Judge Chang entered an order providing in part that, per Respondent's
filing stating that all subpoenas issued to the City were closed, there was no pending subpoena
against the City. Because the City was under no subpoena obligation, Judge Chang instructed that
Respondent "shall not communicate with the City's counsel about any demands for records based
on any obligation purportedly arising out of this case." (Adm. Ex. 4 at 143).

### C. Analysis and Conclusions

#### Rule 4.4(a)

We find the Administrator proved by clear and convincing evidence that Respondent
violated Rule 4.4(a) in his emails to Ritter. The evidence established that Respondent was the
person who sent the emails, and that he did so in representing Bryan Singer. The emails came from

an account entitled "Law Office of Felipe Gomez, Esq" with an email address of t312.399.3966@gmail.com. This was the same email address Respondent included on subpoenas he issued in connection with the Singer case as well as his FOIA requests involving Ritter. The emails contained information that was within Respondent's unique knowledge and were similar in tone to each other and to Repsondent's demeanor in this proceeding. We have no reason to believe that anyone other than Respondent authored and sent the emails.

We further find that the emails had no substantial purpose other than to burden and harass Ritter. They were harassing both in their quantity and their language. We found credible Ritter's testimony that she was making efforts to provide the documents Respondent requested. There was no reason, therefore, for Respondent to send multiple emails per day other than to harass and burden Ritter. There was also no legitimate purpose in telling Ritter she should resign and had violated her professional duties or to threaten further action against Ritter. We further find that Respondent's emails informing Ritter of his FOIA requests for her communications were sent for the purpose of harassment. While Respondent has the right to submit FOIA requests, the fact that he sought information completely unrelated to the Singer matter demonstrates that his intention was to try to intimidate and embarrass Ritter. Accordingly, we find the Administrator proved by clear and convincing evidence that Respondent violated Rule 4.4(a) as alleged in Count III.

Rule 8.4(d)

The Administrator established actual prejudice to the administration of justice with the evidence that Ritter had to spend time responding to the vast number of Respondent's emails and had to file a motion in order for Respondent to cease his communications. In addition, the Court spent time and resources addressing Respondent's conduct and instructing him not to communicate any further with Ritter. Accordingly, we find the Administrator proved by clear and convincing evidence that Respondent violated Rule 8.4(d) as alleged in Count III.

20

We note that our findings as to Counts I-III were made without drawing any adverse inference based on Respondent's assertion of his Fifth Amendment privilege against self-incrimination. The Administrator asked us to draw such an inference, but we find it unnecessary because the evidence presented at hearing left us with no doubt that Respondent committed the charged misconduct. See In re Kearns, 04 CH 80, M.R. 22495 (Sept. 17, 2008) (Hearing Bd. at 37).

## EVIDENCE IN AGGRAVATION AND MITIGATION

### Aggravation

The recipients of Respondent's emails described them as "mortifying," "disconcerting," "frustrating," and "threatening." (Tr. 79). Vincent Schmeltz testified that Respondent called his 80-year-old father in March of 2021 and attempted to obtain Schmeltz's address. (Tr. 115).

During this disciplinary hearing, Respondent expressed his view that the intent of the hearing was to "get a predetermined result" and deny him due process. Respondent threatened to sue Vincent Schmeltz while Schmeltz was testifying. (Tr. 163). Respondent issued several "warnings" when he did not like certain testimony, lines of questioning or rulings. When the Chair advised him against issuing warnings, Respondent stated it was his right to do so. (Tr. 352, 357, 359, 360, 372).

### Mitigation

Respondent elected not to offer to the Panel any evidence in mitigation.

### Prior Discipline

Respondent does not have any prior discipline from the Illinois Supreme Court.

## RECOMMENDATION

### A. Summary

Based on the serious nature of the misconduct, the factors in aggravation, and the minimal amount of mitigation, the Hearing Board recommends that Respondent be suspended for three years and until further order of the court.

### B. Analysis

The purpose of the disciplinary process is not to punish attorneys, but to protect the public, maintain the integrity of the legal profession, and safeguard the administration of justice from reproach. In re Edmonds, 2014IL117696, ¶ 90. In arriving at our recommendation, we consider these purposes as well as the nature of the misconduct and any factors in mitigation and aggravation. In re Gorecki, 208 Ill. 2d 350, 360-61 (2003). We seek consistency in recommending similar sanctions for similar types of misconduct, but must decide each case on its own unique facts. Edmonds, 2014IL117696, ¶ 90.

The Administrator has requested a recommendation of disbarment. Respondent did not propose a particular sanction but asked us to recommend a sanction less than disbarment. We agree with the Administrator that a significant sanction is warranted but, for the following reasons, recommend a lengthy suspension until further order of the court rather than disbarment.

Respondent's conduct was extreme and egregious. The abusive and aggressive language Respondent directed toward the seven attorneys involved in this matter has no place in the practice of law and brings the legal profession into disrepute.

There are substantial factors in aggravation. Respondent's misconduct occurred repeatedly in three separate matters and was not limited to matters in which he was a party. In addition to verbally abusing opposing counsel, he sought out attorneys who had no involvement whatsoever

22

in the matters he was litigating and subjected them to threats and harassment as well. His language caused the recipients of his emails to feel embarrassed, harassed, and fearful for their safety.

We also consider in aggravation Respondent's conduct in this proceeding. His behavior appeared to be designed to delay and obstruct the proceedings. He filed numerous motions with the Supreme Court on the eve of hearing, seeking additional time to complete discovery that he had already been given extra time to complete. Once the hearing began, he continually made speaking objections and interrupted the Chair, opposing counsel and witnesses. His issuance of "warnings" to participants in the hearing and threats to sue a witness while he was testifying were inappropriate and troubling.

Respondent's invocation of his Fifth Amendment privilege against self-incrimination is not a factor in aggravation, but the improper manner in which he did so was another example of his pattern of obstructing the proceedings. There were several problems with Respondent's invocation of the privilege, including an absence of any indication that his testimony in this matter could implicate him in a crime. The privilege applies only to evidence that could be used against a person in a criminal case and does not apply to evidence that bears only on one's right to continue to practice law. See Zuckerman v. Greason, 231 N.E.2d 718 (N.Y. 1967). If there are no reasonable grounds to fear self-incrimination, the privilege should not exist. In re Zisook, 88 Ill. 2d 321, 332-333, 430 N.E.2d 1037 (1981). However, it is for a court rather than this Panel to determine whether reasonable grounds existed. Id. This leads to the next problem with Respondent's invocation of the privilege—his blanket refusal to testify. Invoking one's Fifth Amendment privilege does not permit a lawyer to simply refuse to testify, as Respondent did. The Court has specified that a witness in a disciplinary proceeding "must appear, as commanded, and claim the privilege as to each incriminating question." Zisook, 88 Ill. 2d at 333. The Administrator may then seek a judicial determination as to whether the privilege properly applies to particular

23

questions. Id. The Court reasoned that allowing a witness sole discretion for asserting the privilege would create "a substantial opportunity for abuse." Zisook, 88 Ill. 2d at 331. By refusing to testify, Respondent not only failed to follow the procedure outlined in Zisook but, in doing so, appeared to commit the type of abuse the Court sought to prevent. In that same vein, Respondent's assertion that he was not required to testify because the Administrator did not serve him with a subpoena lacks merit. Respondent had a duty to appear at hearing, pursuant to Supreme Court Rule 753(f). At the very least, he was obligated to take the stand and assert the Fifth Amendment privilege where he believed there was reasonable grounds to do so. It appeared, however, that Respondent did not have a legitimate concern about incriminating himself but only sought to frustrate the Administrator's presentation of evidence. While we are mindful of Respondent's right to invoke his Fifth Amendment privilege, we believe it is appropriate to consider his complete disregard of established rules and procedures as part of his pattern of obstructing this proceeding.

We further find that, other than apologizing for using profanity, Respondent has not shown that he recognizes his behavior was wrongful or intends to reform his communications in the future. His contention that witnesses' concerns for their safety were not credible leads us to conclude that he does not understand or acknowledge the negative impact of his words. Respondent further demonstrated his failure to accept responsibility for his conduct by accusing others of wrongful behavior and maligning the integrity of the Commission and the Panel. It is a significant aggravating factor where an attorney fails to take responsibility for his or her own misconduct and instead impugns the integrity of the disciplinary process. In re Gray, 2016PR00045, M.R. 29543 (Nov. 15, 2018) (Review Bd. at 14).

There is very little mitigation for us to consider. Respondent did not present evidence of good character, pro bono representation, or other charitable or community contributions. He mentioned he had been in treatment for alcohol dependence around the time he wrote the emails

at issue. However, he did not present any evidence that would allow us to ascertain whether there was a mitigating causal connection between his condition and the misconduct. We have considered that he has no prior discipline, but this has a minimal impact upon our recommendation in light of the egregious misconduct and significant amount of aggravation.

While our research has not revealed another case in which the misconduct closely resembles the misconduct in this case, the Administrator's cited cases provide guidance as to an applicable range of sanctions in cases involving similar but not identical misconduct. See In re Zurek, 99 CH 45, M.R. 18164 (Sept. 19, 2002) (disbarment for falsely accusing judges of criminal conduct and making vulgar and abusive remarks toward an opposing party), In re Ditkowsky, 2012PR00014, M.R. 26516 (March 14, 2014) (four-year suspension until further order of the Court for making false statements about judges and attorneys related to a guardianship matter), and In re Denison, 2013PR00001, M.R. 27522 (Sept. 21, 2015) (three-year suspension until further order of the Court for making false statements about judges and attorneys in blog posts).

Of the Administrator's cited cases, we find Ditkowsky most similar to the instant case. Ditkowsky was found to have sent 400-500 emails to various individuals involved in a guardianship matter. In those emails he accused guardians *ad litem* and judges of criminal conduct. The false accusations against judges make Ditkowsky's conduct somewhat more egregious, but the volume and pattern of harassing emails is quite similar to Respondent's conduct. Also similar were Ditkowsky's lack of recognition that his actions were wrongful and lack of mitigation. Ditkowsky was suspended for four years and until further order of the Court. In our view, Ditkowsky supports a recommendation in this case of a lengthy suspension until further order of the Court.

We do not find that disbarment is warranted. The misconduct that led to disbarment in Zurek included falsely accusing a judge of criminal behavior, which is not present here. Zurek's

25

troubling and bizarre behavior during his disciplinary hearing, which included leaving the hearing while it was in progress, was also a significant consideration in disbarring him. Although Respondent's conduct in this hearing was problematic, it was not as egregious as Zurek's.

That said, based on our observations of Respondent and his behavior in this proceeding, we have no choice but to conclude that he presents a significant risk of committing further misconduct that would harm other lawyers, the reputation of the legal profession, and the administration of justice. For this reason, in conjunction with the extensive misconduct, significant aggravation, and minimal mitigation, we recommend that Respondent be suspended for three years and until further order of the Court. We strongly believe Respondent should be required to demonstrate that he is able to conduct himself in a professional and ethical manner before he may resume practice.

Accordingly, we recommend that Respondent, Felipe Nery Gomez, be suspended for three years and until further order of the Court.

Respectfully submitted,

Kenn Brotman
Kenya Alicia Jenkins-Wright
John Burns

## CERTIFICATION

I, Michelle M. Thome, Clerk of the Attorney Registration and Disciplinary Commission of the Supreme Court of Illinois and keeper of the records, hereby certifies that the foregoing is a true copy of the Report and Recommendation of the Hearing Board, approved by each Panel member, entered in the above entitled cause of record filed in my office on January 7, 2022.

/s/ Michelle M. Thome
Michelle M. Thome,
Clerk of the Attorney Registration and
Disciplinary Commission of the
Supreme Court of Illinois

MAINLIB_#1457272_v1